The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Thank you. Be seated. Ready to hear argument in the last case of the day and our last case of the court term, United States v. Horsley. Mr. Branton. Good morning, Your Honors. Mr. Brant, Jeff Brant on behalf of Mr. Horsley. Our first argument on appeal is that the district court erred in denying Mr. Horsley's motion to suppress cell phones and there are several sub-arguments to that. The first is a series of arguments that the district court clearly erred in making the material findings of fact necessary to deny that motion. And we understand, Mr. Horsley understands, that clear error is a difficult standard and it's not often that this court finds clear error has been made but we believe the record warrants it in this case. The first such instance is the district court finding of where Mr. Horsley was at the time of his arrest because this is based on Agent Abadir's testimony but she testified as to when she entered the room and the record is clear that she was not in the room. And where did she say he was at the time of his arrest and where do you say he was at the time the cell phones were seized? Agent Abadir testified that he was next to the bed by the time she entered the room. She doesn't know where he was when he was arrested. Another witness at the suppression hearing, Ms. Cullen, testified. Next to the bed on the far side of the cell phone was on the table on the other side of the bed, correct? Yes, Your Honor. And he was on the side of the bed closest to the door and the bathroom which is opposite of where that rectangular table was sitting. She admits she wasn't present when he was arrested. She says that at Joint Appendix 96 through 98. But the district court makes a finding that because Mr. Horsley was next to the bed where Agent Abadir said he was when she entered that this meant that he could reach the phone. Whether he could reach the phone is a different issue but simply that finding that he could base a finding that where he was when arrested is a clear error because that testimony was not accurate about where he was. Even assuming it was accurate where you're saying he was on the other side of the bed from the cell phone, he couldn't have reached it even then? That's correct. Handcuffed behind his back, possibly still clear. And yes, on the other side of the bed from the telephone that was found on that rectangular table. The district court went on to find a fact that Agent Abadir said that Mr. Horsley could have reached the phone. But again, that testimony was based on a hypothetical that the judge posed to the agent. Agent Abadir had already clearly, unambiguously testified that he could not have reached the phone. It was only once the district court says, well, what if he wouldn't have been handcuffed? She said, well, okay, well, under that hypothetical, yes, he might have been able to reach them. And then when, then the testimony went away to another issue and then came back, and when she again talked about whether he could reach Mr. Horsley. But he was handcuffed, right? He was handcuffed behind his back. And the other witness testifying about where he was located said he went to the door without any clothes on. And what Fourth Circuit authority supports your position? Our best case is probably Davis, but we've also cited Tenth Circuit and Seventh Circuit cases about handcuffed behind the back. What about therapy? How do you deal with therapy? Well, therapy is about searching a backpack. A cell phone is not a backpack. A cell phone is not an opaque container that might contain a gun or drugs. What about this, what about the government's argument that there is no search of the cell phone, that they seized the cell phone? Yes, unclear error. Even if we don't succeed on clear error, the cases that the judge is citing in support of seizure don't talk about seizure of a cell phone. They talk about the search of opaque containers to make sure that the safety of the officers is protected. It makes complete sense. But if the cell phone is picked up, it doesn't have a razor blade in it, it's not a fake cell phone, then it's not a threat to the officers. And if it's not in Mr. Horsley's immediate control, in his pocket, or as in the Riley case, it's in his pocket. And I think in Riley they said, I think the issue with Riley is they didn't acquire a search warrant. It didn't require, that it did require a search warrant to search the inside of the phone. But it was, in Riley, the question of whether they could seize the phone was not an argument made. It was, the Supreme Court said, whether the phone could be seized was not contested, and that's probably smart. The government points that out. But in Riley, the... Did they use the phone at trial? I'm sorry, Your Honor? Did they use the phone at the trial? Yes, Your Honor. And how did they use it? As a part of the extensive questioning of Officer Bailey on the context of what the texts were, and his interpretation of what those texts meant. The government said... The text that they got off the phone? Both. I say both. It might have even been three phones, because there were two in the Jaguar. The government's... So given this evidence against your client, other evidence against the client, even if we found that this cell phone was improperly seized at the time of the arrest, wouldn't that be harmless error? We submit it's not harmless error. The government says this is not a text-based case. But the length of the... The amount of testimony about what's on the texts... Well, there was... To Judge Berner's point, there's a lot of other evidence here. There's controlled buys, tons of drugs, money... Yes, Your Honor, and as the... Admissions, co-conspirator testimony, on and on. There's a lot. The government says, thinking it's supporting its own argument, that Mr. Horsley admitted to being a cocaine dealer. Okay, he did, but what did he get convicted of, and what did the government seek to convict him of, and what was the basis for that? It was beyond his admission of being a cocaine dealer. The government was... Right, and the evidence at trial was well beyond his admission of being a cocaine dealer, and also well beyond this cell phone. It was the testimony of his co-conspirators. It was drugs and money, a million dollars found in one of the locations, cash. If Your Honor would indulge me, if you're a juror, and a big part of the case is text evidence to corroborate... I'm sorry, I think it was a million dollars worth of drugs, not cash. I'm sorry, go ahead. The jury had to decide whether they were going to believe Adgerton, his alleged co-defendant, co-conspirator. There's reasons not to believe him because we don't believe people who are testifying in order to save themselves. The text messages were used by the government to corroborate Adgerton. But Adgerton also used text, testified to text messages between he and the defendant, right? Some of them, yes. Yeah, so I guess what I'm not clear on is how do we handle this issue because you had multiple phones, you had text messages that go to both ways, so you had the co-defendant testifying to text messages between the two of them, which I don't believe are a challenge. So how do we find clear error on this one phone if there is any error? When, like Judge Thacker said, when there's all this other evidence out here, multiple phones, text messages, I think they said that Adger, there was 31 pages of the transcript were text messages between Adgerson and Bailey, that it took up 31 pages of the transcript, which seems to be quite a bit of text messages. Yes, Your Honor, that's what I'm trying to convey is that you're a juror. You know this is all about using texts and Officer Bailey interpreting those texts, even though he was not qualified as an expert, to explain to the jury why these texts prove what we're saying, that Adgerton and Horsley were talking about drugs more than just cocaine. And for 31 pages, text messages are read. How is the jury supposed to know which ones of these are from Exhibit 85, Government Exhibit, or is it 83, N2, or the other texts, other phones? The jury's not going to be able to keep track of which phone and which texts to know which of these actually corroborate Mr. Adgerton, therefore showing that it's not harmless error. It is a text-based case, and if you're going to present a text-based case and improperly have an officer testify on the meaning of these texts... Is there an objection on that basis during the trial? Yes, Your Honor. Any testimony? Yes, Your Honor.  It's not that specific. It's an objection to this testimony. I don't think it's the word expert we used when that objection was made, but the briefing is correct. My wording in the brief about what the objection is and the government's briefing on how non-specific that is, is accurate. And do you believe he would have been qualified as an expert had the government attempted to testify? We'd have to see a proffer of Officer Bailey on how much expertise he has. He was not a person on the text to be able to testify, so it'd have to be established that he has the type of record that would show that he knows, and we don't have that proffer, so we're unable to say. But the other officer was qualified as an expert, doesn't he? And for whatever reason, the government didn't use that officer, who has become qualified as an expert, to go through its text-based case to prove that Adgerton is telling the truth and not just lying to save himself, to convince the jury that Mr. Horsley is more than what he admits. And it is harmful error for someone to put on a defense that, yes, I'm ideal cocaine, so you're going to hear some evidence about me texting about drugs, but I did not do all these other things that the government says. And then the government puts on text-based evidence, including texts from the phone that was illegally seized before the jury, and then expect the jury to be able to, expect this court to know. I mean, what did the jury believe? What did the jury not believe? How much of those texts were from a particular phone? We would ask the court to find that it's clear error, even if it were not defined clear error, find that the cases the court used to overturn the motion to suppress were not applicable. Not because we're saying, at no point are we saying that as a matter of law, that seizure of phones is never going to be appropriate under search incident to arrest. What we're saying is, where are the cases that show that they apply as the facts are in this case? All right. Thank you. You have some time in rebuttal. Mr. Juhon? Thank you, Your Honors, and may it please the court. I'd like to start right on the merits of the seizure incident to arrest question, and then later talk about good faith and harmless error. Under Shumail, in this court's cases, the key inquiry is whether the item seized by law enforcement is within an area that it's reasonable to believe that the arrestee may gain access to during the course of the arrest. And how is it reasonable to believe, under these facts, that he could have gained access to the cell phone when his hands were handcuffed behind his back, and the cell phone was across the bed on another table? And were there officers in the room, or they just left him there alone? The officers were present. How many were in there? The record says marshals plural, so there's at least two marshals, plus we have Agent Abadir that enters and seizes the phone. How is it reasonable that he's going to gain access to the phone in that situation? Happy to walk through the facts that we would say support our argument under Farabee in cases like Silva, and I take them in order. And Davis. Let's talk about Davis, too, because in Farabee, you go ahead. Thank you, Your Honor. One fact is, these are four undisputed facts. One, at all times, Mr. Horsley remains near the phone. What do you mean near the phone? How near to the phone was he? Wasn't it across the bed? It was across the bed. He was further away from the phone than you are to the other side of the table you're standing at right now, correct? Because it was a queen size bed. Yes, yes, it's correct. All right. Yes, and that's near. All right, go ahead. Yes, Your Honor. That was the testimony. Where was the, okay, go ahead. So the testimony that was undisputed was that it was near. It was the table that it was on was two to three feet from the opposite edge of the bed. Okay, so the table, so we've got a queen size bed. Correct. And he's not right at the bed, probably. He's at least somewhat beyond the bed. So we've got a queen size bed, and then two to three feet, and then the table, and that's where the cell phone was, and he's handcuffed with his arms behind his back. Go ahead. That's near in your view. What's the second thing? The second thing, Your Honor, is that the room was small, and that, I think, goes to the nearness point. The hotel room. Correct, yes. The third point is that as... So it's small, and there's marshals, plural there. So now he's in a small room with marshals in close proximity to him, several feet across the bed with his arms handcuffed behind his back, and that's near, and he can get to that cell phone reasonably. That's your argument. I have some more facts I'd like to... Okay, go ahead, because that's two. That's two. The third and fourth, I'd say, is that he's in an upright posture, which is an important distinction between Farabee and Davis. I think Davis recognizes that the face-down posture of the individual who's handcuffed is important. So he can leap across the bed more readily. Quickly two steps, yes, if the marshals... It's got to take more than two steps. I think he's got to leap across the bed, right? They're not going to let him run, or he could run around the bed if the marshals are inept, I guess. I think... Which they are not. Thank you, Your Honor. I'm not saying they are. Marshals are quite qualified. Thank you, Your Honor. That's why this is not reasonable. The third point, and then I'd like to move on to a different point, is, of course, the existence of a third party there, which was an important factor in Farabee that was distinguishable in Davis. Why is it important? It's important for this reason, Your Honor. One of the things Howard Davis talks about is the security and the uncertainty of the situation. In Howard Davis, it's a secluded swamp where there's a three-on-one, three officers, one individual, not other people around, and so when there is another... Anytime there's someone else in the room or in the house, then that changes our analysis for a reasonable search incident to arrest? Reasonable seizure, yes, it can, Your Honor. It doesn't always have to. Of course, it's a totality of the circumstances test under this court's precedence in Silva and Farabee and Howard Davis. The idea here is that another individual can distract the marshals. They can make a sudden movement. They can do something that the marshals might, at that moment, not be paying close attention to the arrestee. I would also like to... Where was the... It was his fiance, right, or his girlfriend, or another woman was in the room. Correct. Where was she located? Her testimony was that she was sitting on the bed near where Horsey was. She was sitting on the bed? Yes. Okay. Yes. Now he's got to jump over her, I guess. He could still go around the bed, as the Honor recognizes. I would like to point one other... What exactly are the marshals doing? Do they have their hands on him, or do they not? I think at J98, and this is important, Agent Abadir is asked, could he have physically reached the phone with his hands, without moving, basically? The answer is no, and the reason is why. It's because of the handcuffs. We think that, yes, the handcuffs were a physical restraint on his wingspan, but her answer was not, oh, he couldn't have because of the marshals were holding him. We think the district court drew a kind of negative inference, rationally so from that, that the marshals weren't holding him physically at that moment. Right, but he was handcuffed. He was secured. Correct, Your Honor. Correct. So, yeah, that's another good point. So how was he... So now he's got to leap over the bed, over the woman sitting on the bed, and what, grab the phone with his mouth? I think that would be unreasonable. I totally agree with that, Your Honor, and I'd like to spin out kind of one way in which there's an evidence danger question here. We are not claiming that he would have been able to go around the bed and manipulate the phone with his hands and open the phone and hit delete. What we are saying would be reasonable to think could happen is that all he needs to do is get near the phone to knock it off of the table. Phones can break when they hit the floor, and so we think on all the facts overall here, it was a reasonable basis to think that that was possible. Now, I understand I may have an uphill battle with the court on that. How was the table in the bedroom? That's not in the record, Your Honor. Okay, a normal like hotel room table. I would, yes, I think that that's going to break when it hits the floor and destroy all the evidence. We think it's reasonable that it could have, but I understand that, you know, the record is not well developed on some questions in this case. I would like to turn to good faith, and I think that there are a couple cases that support the application. I want to ask you a couple more questions about Farabee, actually. Of course. So in Farabee, there is a key distinction there. The actual holding in Farabee was that the search was all right because the individual there disavowed ownership of the backpack or whatever it was they were going to get. So that's a key distinction in Farabee, and that was the primary holding. So what's your response to that? Twofold, Your Honor. I think there's a dissent, of course, that points that out in Farabee. We think that the second analysis, the incident to arrest analysis, was dicta. We believe that it was an alternative holding in light of the dissent. We, of course, have recognized that Howard Davis then comes along and distinguishes Farabee. Howard Davis, and I know Your Honor was on the panel, suggested itself that Farabee was dicta. It did not itself hold that, and so obviously that's a, you know, I think that's a question that a subsequent panel could ultimately resolve. I do want to turn to good faith. Like this panel? Correct. If you think it's dispositive of the question, we don't think it is, and the reason we think it is is because of cases like Silva and the Supreme Court's decision in Riley, and I'd just like to talk briefly about those, both to the merits, but especially as to the good faith inquiry. In Silva, it's a case from this court that's somewhat factually similar, where FBI agents came in with guns drawn and this court permitted search and seizures of zip-locked bags incident to the arrest, and so we think that a reasonably trained officer at this point in time, in 2019, when the seizure in this case happened, when Farabee had not yet been decided and when Howard Davis had not been decided, could have looked at Silva and also could have looked at pages 390 and 391 of the Supreme Court's decision in Riley, where the Supreme Court specifically talks about, yes, government, you have to get a warrant to search the phone, but your evidence preservation concerns can be addressed by seizing the phone and putting it in a Faraday bag or disconnecting the battery. And you have a good argument that even if the phone should have been suppressed, that it was harmless. Correct, Your Honor. Would you like to go through all the other evidence that makes this harmless? Absolutely, Your Honor, I would be happy to. There are several kilograms of actual drug weight seizures in hand from the Blackburn Street Stash House. It was three kilograms of methamphetamine, two kilograms of cocaine, and one kilogram of heroin, I believe. The Misty Mountain text messages, that is Mr. Horsley's home, were from the phone on a text message. I'm sorry, there were text messages on his phone at his home in Misty Mountain. They talked about how he was like the cartel, how he was the plug for Lynchburg, that is the source of supply, as Detective Knapp explained. There is the O-sheet that is found at the Misty Mountain home. There is also Adgerson's testimony, which is not just corroborated by text messages, it's corroborated by other individuals, such as Mr. Smiley, who testified to dealing with Mr. Horsley for drugs, and who also testified that Mr. Horsley offered Mr. Smiley methamphetamine and heroin in addition to being a cocaine dealer for him. Additionally, there is evidence at the well as $70,000 in cash. We think that evidence overall, as Detective Knapp testified and went through very extensively, who was qualified as an expert, to talk about what drug terms mean, like cream and ice, that's methamphetamine, what a band is, what a plug is. We think that there was overwhelming evidence in this case. Are you relying on the evidence that was provided? Yes. For harmless error purposes, we don't think we would need to. Obviously, there is the Jaguar question. I'm happy to discuss that. We think the Jaguar seizure was appropriate. That evidence is in the... Tell me, because I'm interested in the seizure, because it's my understanding that he's in the hotel room. I believe the officers go get the argument that it's subject to forfeiture. What evidence at the time of the search, of the vehicle, of the Jaguar, what evidence did the government have to search that vehicle at that time? A couple of answers, Your Honor. For forfeiture purposes, because you got to be and I know one of the arguments is that he told someone during a controlled buy, but he wasn't in the Jaguar, that he owned the Jaguar. Is that correct? Correct. That is one piece of evidence. At the time the seizure happens, Detective Bailey, as he testified, who's in Virginia at this time, is in communication with Agent Avedere. He says, we have evidence that Horsley is a... He didn't say this, I'm sorry. We're under the collective knowledge doctrine here. The communication from Bailey to Avedere is to go seize the Jaguar, so Bailey's knowledge is imputed for purposes of your question about the seizure and the search. Detective Bailey at that point in time knows that Horsley is a major drug dealer. He has investigated and has asked about his employment records and knows he has no legitimate employment, knows that he is taking extravagant trips. He has that type of information. Again, they had search warrants at this time for the drug dealing activity in Virginia. Based upon that... But not a search warrant for that vehicle. There was a search warrant for that vehicle, but it was a Virginia search warrant, so there wasn't a Maryland search warrant, but there is still the alternative basis to seize the vehicle as a probable cause that it was proceeds of drug dealing activity. I guess what I'm trying to figure out is how on the scene, because he's not... I don't think there's any evidence in the record that he was... I know there are control buys, but that he was in that car when these control buys occurred. There's no... I believe the car is in a sister's name or something? Is that right? It's in a sister's name, but there's no evidence of how he purchased that car, and so I'm a little concerned about this because I guess think that there is or there's some probable cause that they think that they're going to be able to forfeit the car, then they can search the car. Right, Your Honor, and so let me try to distinguish the two different bases that exist in the record to initially seize the car, and then once we've established the seizure, we can talk about the search. The basis that the district court relied upon based upon the suppression litigation was proceeds of drug trafficking, so we agree that there's no direct testimony that, yes, Horsley was the guy who bought the car, but this was a probable cause determination, and we think it was reasonable drawing fair inferences from the circumstance, and Detective Bailey, in fact, testified that often drug dealers do, in fact, title things in other people's names to avoid this kind of issue, so that's the theory at suppression litigation. I understand the theory at litigation. I'm and decide that they're going to go to the valet, get the key, and search the vehicle. Correct. Without a search warrant. Correct, Your Honor, and my response to Your Honor's question is that night, at that moment, everyone agrees Agent Avedere doesn't have those facts in her head, but under the collective knowledge doctrine where Officer Bailey was in communication with Agent Avedere, what he knew at the time, and he testified this at length at the suppression time, is imputed to her under the collective knowledge doctrine, and I'm happy to submit, I know we didn't, I don't think the parties briefed that issue directly, I'm happy to submit a 28J on that question, and so that's the evidence what Detective Bailey knew at the time is imputed for seizure purposes. So they can seize the car. Correct. They can search the car. Correct, as an inventory. As an inventory, but that doesn't get you to the trunk, right, because they can't inventory what's That's our understanding, and so I want to distinguish here between probable cause, investigatory searches, and inventory searches. So under the inventory search, they can inventory the trunk as well, even if it's locked and closed? That's our position, Your Honor, because the whole purpose of the inventory doctrine is to make sure two things. One, that there is not some dangerous item in the car that's going to have to be transported and seized and moved, and two, to make sure that there's a safekeeping and an inventory, so to protect against allegations of theft and lost property, and so it's important to be able to inventory what is in the vehicle property-wise in order to facilitate those rationales of the inventory search. Well, it appears that you all searched the vehicle, and then this forfeiture argument comes up during suppression, because you said that there was search warrants for all the other vehicles, but this one just happened to be in Maryland. Respectfully, Your Honor, we disagree with that. We think that there were both bases that existed, both that it was, and you can look at the indictment. To the extent the court is concerned that there was subterfuge here, we don't think that's accurate. In fact, the government has proceeded on the forfeiture proceeding separately on the Jaguar vehicle, and so this isn't a case where we've made the argument and the government just, you know, actually didn't go through with it. We have proceeded. But you proceeded after, this forfeiture is not, the proceedings for forfeiture were not at the time that the car was searched. They're post-search, right? That's correct, Your Honor. That's how the probable cause seizure of an item would typically work, is that we would, and I confess I'm not a forfeiture proceduralist, but my understanding is that you either have the warrant to seize the item, or there's probable cause that it is forfeitable. If there's probable cause that it is forfeitable, it can be seized, and forfeiture proceedings can then be initiated. In this case, Mr. Horsley himself waited to file a claim on the Jaguar. He actually waited until after the verdict. The district court has authorized an interim sale of the Jaguar, and so pending the outcome of this appeal, there will be a final adjudication of the status of, the forfeiture status of the Jaguar. Why isn't the trunk a closed container? So they don't, they need to have a policy that allows them to search closed containers, isn't that right? I'm not quite sure that that's right, Your Honor. I think for closed containers, I acknowledge that in the investigatory context, the Supreme Court has been a little over the map on, in recent decades on that. You're saying this is an inventory search, not an investigatory search, so this is correct, this is inventory, correct, and the trunk is a closed container. Correct. Don't they need to have a policy to search closed containers? You're asking as a matter of law, is that required that the policy specifically enumerate closed containers? I don't think that that's required as a matter of law. The testimony here is that she searched the vehicle pursuant to DEA policy. She didn't elaborate, Agent Abadir did not elaborate on the specific contours of that beyond that. She did not make it more specific, so we don't know at that level of specificity, but we also don't think that there has to be that level of specificity as a matter of law. Do you think she can just testify that there was a policy, but she doesn't have to say what the policy was? Well, no, she did testify that there was a policy. It wasn't just, hey, there's some policy. It was, we have a policy of searching vehicles incident to forfeiture seizure, and so she explained that, and so I think that's all we have in the record. That's the extent of it, Your Honor. I'm guessing your other argument would probably be that I guess the fruit from the search of the cars is minimal compared to all the other evidence. That's correct, Your Honor, for the reasons that we've already articulated, and in fact, Judge Berner, to some of your questions about the trunk, the evidence from the trunk was extremely minimal in this case. I think it was jewelry and maybe some cash, so compared to just the argument, we think that the court, if it wishes to write an expeditious, efficient opinion, it could say even assuming error here, we would affirm on harmless error grounds. If there are no further questions, yes. Let me ask you, and I know time is running out, let me ask you about this supplemental authority that you submitted, I think on the fourth, this new case from the that case is analogous to this case here to Horsley. I'm not sure that it is incredibly factually analysis, I'm sorry, analogous. Your Honor, the reason we cited it at the time is our understanding from the opening brief was that Mr. Horsley was seeking an across-the-board legal rule that seizures incident to arrest just can't apply to cell phones, and my friend today on the other side, I think, has rightly conceded that point here, an argument that that is not the rule that they think exists, so that is a big deal to the government, obviously, and that's why we filed the 28J. And Sessions relies on Riley? Correct, as this court has in cases like Hooper, post-Riley, and endorsing seizures incident to the arrest doctrine on appropriate facts. All right, thank you. Thank you, Your Honors. Mr. Brent, you have some rebuttal time. Thank you, Your Honors. We respectfully submit that there's no reason to search the Jaguar either for probable cause or because of inventory search. On page 39 of our reply brief, we echo what Judge Berner was saying, that this court in Matthews, that case is on page 39, the government is required to have standardized criteria in order to, that and that standardized criteria have to set forth what they do for closed containers and when they can go in and when they can't go in and why. And because my understanding is that was not the government's reason presented at the suppression hearing, there was no testimony about whether that existed here. But I don't even think we get to that because I think probable cause simply does not exist under these circumstances. The testimony was that this was titled to Horsley's sister, that she had personally purchased it, that Mr. Horsley needed permission to drive it, that his former wife, and at the time just a partner but former wife, also had to ask for permission to drive it. And she had the ability to buy the car and purchase it and the government did not bother to find out, you know, anything beyond this evidence that it was titled to her, she used it, and he had to have permission to drive it. And I think there was a good question from the panel about, you know, was it a car that was used to buy drugs and there was no evidence of that. It sounds like this is a car that he borrowed to have a trip to a casino and that the government assumed was the proceeds. He said during one of the controlled buys that it was his, he listed a Jaguar as his vehicle. He said to a, there was a testimony of an officer saying that a confidential informant said that Mr. Horsley said that was one of his vehicles. So triple hearsay or double hearsay or whatever that is, and setting aside that that could just be a puffery, I'm a big deal, I've got a Jaguar, instead of being that's actually my car that I have to ask permission to borrow. We would hope that we don't get to the issue of good faith because clear error would mean that the facts that the judge relied on to make these findings, we wouldn't get to a good faith argument. But if we went and made it to a good faith argument, we would submit that the officers wouldn't be able to rely on Riley or Silva because Riley doesn't answer the question here. Riley is a case that existed before there were cell phones as prevalent, not Riley, the earlier case, Silva. A lot of the case law, it predates cell phones. A lot of the Supreme Court cases- Riley does involve a cell phone. Riley does involve a cell phone, but it doesn't answer the seizure of a cell phone that's not on your person. And the U.S. Supreme Court says it makes sense that you're not challenging the in that case that cell phone taken from a person. But we're asking under these circumstances, what is the case law that says that the government can just assume the cell phone is going to have evidence of crime? Are we going to say as a court, the touchstone of this Fourth Amendment is reasonableness? Riley points this out. Other cases point this out. Cell phones are everywhere. Ninety-five percent of our citizens have them. And the amount of private information on these cell phones is enormous. What about the Sessions case? And I know that's a Ninth Circuit case. It's a recent case, but it relies on Riley and Chimmel. And it says that it is search incident to arrest that law enforcement can see cell phones. But the question presented here is not one of the that's if you look at the three things that district court holds in this case, none of those three things are the question we're presenting here. And that is the seizure of a phone, whether it's close to someone or not close to someone, is that seizure a part of a search? And it's relying on cases like Farabee and Riley that are not answering the question before this court. A cell phone is not a backpack that applies to this case. If the cell phone were the backpack, could in Farabee, the police officer simply seized the backpack without looking inside and walk away? And we submit the answer is no. But that's what the government did here. It seized the cell phone. The cell phone is not drugs or gun or something that can harm the officers or is blatantly, clearly evidence of Are we going to reach a point where we say that people that get arrested are going to assume that we get to take their cell phones? Because that's what the Robinson Supreme Court was concerned about. I'm guessing their argument would probably be that there was probable cause when they got the arrest warrant from cell phones, other cell phones and text messages, that there was evidence that could be destroyed on the cell phone. And our response would be then get a search warrant or get us get a warrant to seize the phones. If you believe that the isn't if the touchstone of the Fourth Amendment is reasonableness and if we're talking about items that have all this private information, shouldn't the rule then be, yes, we're going to have a balancing test or we're going to get a warrant to seize the phone and then later maybe get a warrant to search the phone. Because of the amount of privacy interests, shouldn't we have some sort of test that decides whether we're just going to be a government that allows agents to just grab cell phones because they're in the room and then we'll search. That's what the Robinson Supreme Court case talks about. We can't allow the government to grab, seize items that they're going to search to hope to find evidence to use against the defendant as opposed to what's on his person or her person that is evidence of crime right then and there. You've made a number of different arguments. I'm curious to know whether, and if we were to find that the searches and seizures were improper but they were each individually harmless error, is there any case that stands for the proposition that a compounding of different harmless errors together creates an issue sufficiently strong that we would need to? I wish I knew that answer and I wish the answer was yes for sure, but no. No, Your Honor, I know of none. You would want this to be that case. I can't wait for it to be. Thank you, Your Honors. All right, thank you. I'll ask the clerk to adjourn court sine die and we'll come down and greet counsel. This honorable court stands adjourned sine die. God save the United States and this honorable court.
judges: Stephanie D. Thacker, DeAndrea Gist Benjamin, Nicole G. Berner